Eric Nielson #5327
Laura Nielson #15008
G. ERIC NIELSON & ASSOCIATES
4790 S. Holladay Blvd.
Salt Lake City, Utah 84117
Phone: (801) 424-9088
Fax:    (801) 438-0199
ericnielson@ericnielson.com
lauranielson@ericnielson.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT,
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| PAXSON S.C., KELLY S.C., and M.S.C.,<br><br>Plaintiffs,<br><br>vs.<br><br>MALIBU BOATS LLC and THE MALIBU BOATS LLC MEDICAL PLAN<br><br>Defendants. | **AMENDED COMPLAINT**<br><br>Case No. 1:24−cv−00117<br><br>Magistrate Judge Jared C. Bennett |

**COME NOW** Paxton S.C., Kelly S.C., and M.S.C, collectively, individually, and through their undersigned counsel, complain and allege against the above-captioned defendants as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiff Paxton S.C ("Paxton"), Kelly S.C. ("Kelly") and M.S.C are natural persons residing in Mission Hills, Kansas. They are covered by a self-funded plan, the Cobalt Boats LLC Health Benefit Plan ("the Plan"), provided through Paxton's employer, Malibu Boats LLC, parent company of Cobalt Boats LLC.

2.      Plaintiff M.S.C. is a resident of Mission Hills, Kansas. As a beneficiary of her father's health insurance plan, she received treatment at Elevations Residential Treatment Center

1

("Elevations RTC") from May 29, 2018, to November 2, 2019, a licensed residential treatment facility in Syracuse, Utah, and also received treatment at Change Academy Lake of the Ozarks ("CALO"), a licensed residential treatment facility in Lake Ozark, Missouri, from November 06, 2019 through December 17, 2020.

3. The Plan is an employee benefit plan governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et. seq.

4. This Court has jurisdiction over this matter and venue is appropriate pursuant to 29 U.S.C. §1132(e)(2) and 29 U.S.C. § 1391(c) because the appeals were written by a company located in Salt Lake City, Utah.

5. Plaintiffs seek payment of M.S.C.'s denied claims from July 25, 2020, through December 17, 2020, for treatment rendered at CALO, pursuant to 29 U.S.C. §1132(a)(1)(B).

6. Plaintiffs seek injunctive relief pursuant to 29 U.S.C. §1132(a)(3) and pursuant to the Mental Health Parity and Addiction Equity Act of 2008 ("the Parity Act").

7. Plaintiffs also seek an award of prejudgment interest and attorney's fees pursuant to 29 U.S.C. §1132(g).

**FACTUAL BACKGROUND**

8. M.S.C. was adopted at 6 months of age after being abandoned at birth and living at a Russian hospital until her adoption.

9. As a child, M.S.C. met most milestones on time, but she displayed frequent and easy frustration, often reacting physically by banging her head, biting, and pulling her own hair.

10. M.S.C. began receiving behavioral interventions at the early age of 3 years old and was observed to have behaviors suggestive of Attention-Deficit/Hyperactivity Disorder (ADHD) and/or other executive functioning impairments.

11. In school, M.S.C.'s teachers often expressed concern over her lack of self-control, not following rules, and other impulsive actions.

12. M.S.C was prescribed more than 3 different medications and evaluated by a neuropsychologist by the time she was only 6 years old.

13. In these evaluations it was confirmed that M.S.C. fell into the Autistic Spectrum in addition to having multisensory neuropsychological difficulties.

14. M.S.C. continued to experience social difficulties as she grew, often not understanding the emotions of other, struggling to keep physical boundaries, throwing temper tantrums, physically harming her parents, engaging in self-harm after frustrations, and failing to create and/or maintain social connections/relationships.

15. M.S.C. had an additional evaluation done at 13 in which she was diagnosed with Autism, Mood Disorder, Developmental Coordination Disorder, Anxiety Disorder, and Reading Disorder/Dyslexia.

16. M.S.C. attended a couple different therapeutic boarding schools due to her behavioral struggles. She was bullied at the first boarding school in her sophomore year for being adopted from Russia. She was also bullied, sexually harassed, and assaulted at the second boarding school she attended.

17. M.S.C. often struggled with her memory and recollection of events, sometimes providing mixed reports of certain events or hiding information. When confronted about these behaviors she would have extreme mood shifts and became extremely agitated. This caused difficulty in discerning the true events.

18. M.S.C. also struggled with substance abuse, and her family reported that she would smoke or take any substance, including vape and alcohol, to make better connections with her peers.

19. M.S.C.'s relationship with her family was negatively affected the most during the time she would return from boarding school. M.S.C. would often be physically and verbally aggressive with her family members and herself.

20. M.S.C.'s behaviors were, constant, destructive and bizarre such as staying awake all night, moving furniture, ripping apart floors, making holes in walls, banging her head against the wall, using outfits "designed to shock people", speaking in various accents and using profanity and slang terms including the "n-word".

21. After M.S.C.'s arrived home from boarding school, she refused to return and threatened her family that she would commit suicide if she was sent back.

22. Most of M.S.C,'s volatile behaviors would be triggered by either medication changes and/or her parents attempting to set rules/boundaries. The outbursts would typically end in M.S.C. yelling, breaking things, swearing, and threatening to kill people.

23. M.S.C had multiple emergency room visits due to extreme emotional outbursts and one hospitalization for three days in May 2018 after banging her head and initiating a physical altercation with her mother.

24. M.S.C.'s stayed with her parents after her hospitalization for a year. She was able to hold it together at school, but her behavior continued escalating at home.

25. New behaviors developed such as more substance abuse, stealing, and explosions with periods of calm. This was in addition to the continued screaming, banging head on the wall, destructive behaviors, extreme verbal abuse, etc.

4

26. M.S.C was ultimately admitted to Seven Stars Program at Elevations RTC in May 2019.

27. The Seven Stars Program helped M.S.C. improve in some areas, however, there were still multiple critical incidents that occurred during her stay at Elevations RTC.

28. The first incident, on July 30, 2019, involved M.S.C becoming aggressive toward the staff after being separated from the group for inappropriate behavior. They deemed M.S.C. a danger to others.

29. The second incident, on August 24, 2019, occurred when M.S.C. became upset with her roommate and began throwing items at her roommate and destroying property. M.S.C. began to self-harm after only a few seconds of being escorted to the quiet room and charged at staff. She was deemed a danger to others.

30. The last incident occurred only 4 days before M.S.C.'s discharge date. M.S.C. had a disagreement with one of her peers and began yelling "go kill yourself". She became aggressive with staff and was escorted to the quiet room. M.S.C. then began to engage in self-harm by scratching her arms with her fingernails and trying to suffocate herself. She inserted her finger in her anus and threatened to wipe it on staff. She refused to engage in behavior processing with the staff.

31. M.S.C.'s therapists indicated a need for her to further address her traumas and behaviors and was referred to and admitted to CALO on November 06, 2019.

**PRE-LITIGATION APPEAL PROCESS FOR M.S.C.'S TREATMENT AT CALO**

32. Claims were submitted to the Plan for M.S.C.'s treatment at CALO.

33. On April 20, 2020, BlueCross BlueShield of Tennessee ("BCBST"), the claims administrator for the Plan, sent a letter denying M.S.C.'s treatment at CALO. The denial letter stated, in part:

> After careful review, we are not able to approve an extension of services under your BlueCross BlueShield of Tennessee health plan for the dates noted. We know this is not the outcome you were hoping for, and we're including information below to help idea as you move forward.
> **Why we can't approve the service:**
> The member is medically stable and is not a danger to herself or others. She is not hearing or seeing things that are not present period she is not aggressive or requiring holds. She is medication compliant and there are no ongoing medication changes. Member is at baseline level of functioning. Member does not need 24 hour medical supervision and can be managed in an outpatient level of care.

34. On August 19, 2020, the family submitted a Level One Member Appeal.

35. In the appeal, the family argue against BCBST's rationale that the treatment wasn't medically necessary and outlined how M.S.C.'s treatment at CALO was, in fact, medically necessary to treat her complex behavioral health conditions and chronic illnesses.

36. The family also outlines and included evidence straight from M.S.C.'s medical records that indicated the severity and necessity for continued residential treatment.

37. In a letter dated September 23, 2020, BCBST upheld their denial of M.S.C.'s treatment at CALO. The denial letter stated, in part:

> After review of all available information, including review by a physician medical director specializing in psychiatry. BCBST determined that the services after July 24, 2020, are considered not medically necessary and thus are excluded from coverage, in accordance with the terms of your health benefits plan. Therefore, the denial of authorization and benefits for those dates of service is upheld. Please refer to the enclosed wording from your Evidence of Coverage under the heading Other Exclusions, page 71, including item No. 2 on that page.
>
> However, the Committee determined that inpatient services through July 24, 2020, were medically necessary. Therefore, authorization and benefits for covered services are available for those dates of service. Accordingly,

the claims will be resubmitted for adjustment and the provider will be reimbursed per out-of-network contract benefits for those dates of service, with no penalty for lack of authorization. You will receive an updated notice outlining this adjustment and any amount for which you remain liable. If the plan's benefits are subject to an unmet deductible or coinsurance for the services, some or all of the additional benefits may go to the deductible or coinsurance. Please note: Research found that the claim for dates of service from April 1-30, 2020, has already been adjusted to pay out-of-network benefits, so no additional benefits are available for that claim.

Regarding the dates of service after July 24. 2020, for which authorization and benefits remain denied, the medical director's review found that there is a lack of clinical information such as progress notes, rationale for ongoing treatment, barriers to discharge, serious incidents, etc. on which to decide the medical necessity of the stay. The information has been requested.

BCBST bases its medical review decisions on MCG criteria and the company's medical policies. Medical policies are established using an evidence-based evaluation process. The medical evidence used in this process comes from several sources, including medical technology review organizations, the peer reviewed medical literature, and opinions from appropriate network specialists. All policies are reviewed by a panel of internal and external physicians prior to being adopted by the company…

## **FIRST CAUSE OF ACTION**

**(Claim for Benefits Under 29 U.S.C. §1132(a)(1)(B)), Claim for Equitable Relief Pursuant to 29 U.S.C. §1132(a), and Claim for Breach of Fiduciary Duty Pursuant to 29 U.S.C. §1132(a)(3))**

38. ERISA imposes higher-than-marketplace standards on the Plan and other ERISA fiduciaries. It sets forth a special standard of care upon a plan fiduciary, namely that the administrator discharges all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits. 29 U.S.C. §1104(a)(1).

39. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that plan administrators provide a "full and fair review" of claim denials. 29 U.S.C. §1104(a)(1)(D) and §1133(2).

7

Case 3:25-cv-00076-CEA-JEM   Document 15   Filed 12/06/24   Page 7 of 11   PageID #: 52

40. The Plan's actions or failures to act constitute a breach of its fiduciary duties to the family under 29 U.S.C. §1104 and §1133 in the following ways: 1) by failing to set forth the specific reasons for M.S.C's claim denial, written in a manner calculated to be understood by the family; 2) by failing to provide a "full and fair review," as anticipated in ERISA's claims processing regulations, of the denial of the M.S.C'S claim; 3) by developing and relying upon internal practices and policies that improperly restricted coverage in contravention of Plaintiffs' health insurance plans, ERISA, and the Parity Act; and 4) by failing to discharge all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits.

## SECOND CAUSE OF ACTION

### (Claim for Violation of the Parity Act Under 29 U.S.C. §1132(a)(3))

41. The Parity Act is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and the Parity Act.

42. The Parity Act requires that if a group health plan provides both medical and surgical benefits as well as mental health or substance use disorder benefits, then it may not apply any "treatment limitation to mental health or substance use disorder benefits in any classification that is more restrictive than the predominant ... treatment limitation of that type applied to substantially all medical/surgical benefits in the same classification." 29 C.F.R. § 2590.712(c)(2)(i) (amended Jan. 13, 2014); *see also* IFRs Under the Parity Act, 75 Fed. Reg. at 5413.

43. The Parity Act also requires that if a plan "provides mental health or substance use disorder benefits in any classification of benefits..., mental health or substance use disorder benefits must be provided in every classification in which medical/surgical benefits are provided." 29 C.F.R. § 2590.712(c)(2)(ii).

44. Impermissible nonquantitative treatment limitations under the Parity Act include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

45. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan restricted M.S.C.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does the Plan restrict coverage of medical/surgical conditions based on medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner the Plan restricted coverage of treatment for M.S.C. at CALO.

46. Specifically, the Plan's reviewers utilized internal processes and procedures that may have placed a limitation on the scope of services available for intermediate behavioral health care, while not limiting the scope of services available for intermediate medical or surgical benefits.

47. When the Plan receives claims for intermediate-level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. The Plan evaluated M.S.C.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

48. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan, as written or in operation,

use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

49. The violations of the Parity Act by the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

50. A declaration that the actions of the Defendants violate the Parity Act;

51. An injunction ordering the Defendants to cease violating the Parity Act and requiring compliance with the statute;

52. An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with the Parity Act;

53. An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of the Parity Act;

54. An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of the Parity Act;

55. An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

56. An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of the Parity Act; and

57. An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of the Parity Act.

58. 45. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A.

59. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

**RELIEF**

60. WHEREFORE, the Plaintiffs seek relief as follows:

61. Judgment in the total amount that is owed for M.S.C.'s medically necessary treatment at CALO under the terms of the Plan, plus pre- and post-judgment interest to the date of payment;

62. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

63. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

64. For such further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 6th day of December 2024.

G. ERIC NIELSON & ASSOCIATES

 /s/ Laura Nielson
Laura Nielson
*Attorney for Plaintiffs*